**United States District Court**
For the Northern District of California

1

2

3

4

5

6                           UNITED STATES DISTRICT COURT

7                           NORTHERN DISTRICT OF CALIFORNIA

8

9   In re DONALD L. CLAWSON and
    DEBORAH A. CLAWSON,
10
                    Debtors.
11   _____/

12   DONALD L. CLAWSON and
     DEBORAH A. CLAWSON,
13
                    Plaintiffs/Appellees,          No. C 09-4993 PJH/09-6031 PJH
14                                                    Bankr. Case No.  08-45900
                                                      Adv. Case No. 09-4045 AN
15        v.
                                                   **ORDER RE: APPEAL**
16
     INDYMAC BANKCORP, INC. dba INDYMAC
17   FEDERAL BANK FSB; QUALITY LOAN
     SERVICE, CORP.
18
                    Defendants/Appellants.
19   _____/

20          Appellants and defendants IndyMac Federal Bank, FSB ("IMFB"), which is now

21   OneWest Bank FSB ("OneWest"), and Quality Loan Service Corporation ("Quality"),[1]

22   (collectively "the banks"), appeal the bankruptcy court's October 2, 2009 order enforcing a

23   settlement agreement and the bankruptcy court's subsequent December 10, 2009 order for

24   sanctions, both in adversary case no. 09-4045.  On January 8, 2010, this court related the

25   appeals and ordered consolidated briefing.

26   _____

27          [1]After plaintiffs filed the complaint in the adversary case, OneWest acquired IMFB.
     Although the complaint was never amended to reflect this or to name OneWest as a
28   defendant, OneWest notes in its papers before this court that because the bankruptcy court
     entered orders against it, it has joined in the appeal.

1    For the reasons that follow, the court REVERSES and REMANDS both matters to

2    the bankruptcy court for further proceedings.

3    **BACKGROUND**

4    **A.    Factual and Procedural Background**

5    On October 15, 2008, plaintiffs and appellees Donald and Debra Clawson ("the

6    Clawsons") filed a Chapter 7 bankruptcy petition.  Prior to filing for bankruptcy, on

7    November 21, 2005, the Clawsons executed a deed of trust ("DOT") on their residence at

8    107 Canfield Court in Brentwood, California to secure a $550,000.00 loan.  The loan and

9    DOT were subsequently transferred to IMFB, with Quality as the loan servicer.  The

10   Clawsons were current on their loan through March 31, 2008.  The Clawsons claim that at

11   that time IMFB improperly reset their mortgage payment, raising the monthly minimum by

12   more than $2000 per month.

13   The Clawsons attempted to redress the situation with IMFB with no success.  In

14   August 2008, IMFB and Quality initiated nonjudicial foreclosure proceedings, which were

15   still in progress at the time the Clawsons filed for bankruptcy in October 2008.  On

16   November 17, 2008, IMFB moved the bankruptcy court for relief from the automatic stay to

17   proceed with the forelosure and to sell the residence at a trustee's sale.  In that motion,

18   IMFB alleged that the Clawsons possessed no equity in the property and that they were in

19   default on their mortgage in the amount of $43,579.07.  The Clawsons opposed the motion,

20   arguing that they were not actually in default.  The bankruptcy court heard the relief from

21   stay motion on December 17, 2008, and on January 6, 2009, issued an order granting

22   IMFB's motion for relief from the automatic stay.  The court ruled that the automatic stay

23   was lifted effective January 18, 2009, so that IMFB "and its successors and assigns" could

24   "complete its foreclosure" and "proceed with post-foreclosure remedies."  The court also

25   waived the stay of the order provided by Federal Rule of Bankruptcy Procedure ("FRBP")

26

27

28

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

1   4001(a)(3).[2]

2        However, on January 9, 2009, the bankruptcy court issued an amended order

3   granting relief from the stay.  That order provided that relief from the stay was effective

4   upon the Clawson's chapter 7 discharge.  It contained no waiver of the FRBP 4001(a)(3)

5   stay of the order.

6        On January 14, 2009, IMFB and Quality noticed a trustee's sale of the residence for

7   February 13, 2009.  The Clawsons' discharge, however, was not entered until January 20,

8   2009, and was not served until January 23, 2009.  Therefore, in accordance with the

9   bankruptcy court's January 9, 2009 order, the automatic stay would have been in effect

10  until February 6, 2009, and the filing of the notice of the sale would likely have violated the

11  stay.

12       On January 28, 2009, the Clawsons filed an adversary proceeding against IMFB and

13  Quality alleging two claims.  In their first claim, the Clawsons sought a declaration that the

14  banks were not entitled to go forward with the trustee's sale because they had improperly

15  reset their monthly payment.  They also sought a temporary restraining order and a

16  preliminary injunction enjoining the sale.  The second claim was for damages for willful

17  violation of the automatic stay pursuant to Bankruptcy Code § 362(K).

18       Between the filing of the adversary proceeding and the first status conference in the

19  adversary case on March 25, 2009, the Clawsons and the banks were engaged in

20  negotiations to modify the terms of the loan underlying the DOT and were also negotiating

21  a settlement of the adversary case.  On March 5, 2009, the Clawsons filed a motion to

22  abandon real property under Bankruptcy Code § 554 in their main bankruptcy case.  The

23  Clawson's motion noted that they wished to renegotiate with the banks to obtain a loan at

24  fair market value or above, and that in order to obtain a loan modification, it was first

25  necessary that they "abandon" the property under the Bankruptcy Code.  That motion also

26  ─────────────────

27       [2]FRBP 4001(a)(3) provided that an order granting a motion for relief from stay was
    automatically stayed for ten days (now fourteen days under the current rule) unless the
28  bankruptcy court ruled otherwise.

United States District Court

For the Northern District of California

1  noted that the Clawsons wished to settle their claim against the banks based on the banks'

2  violation of the automatic stay.  On March 26, 2009, the bankruptcy court granted the

3  Clawson's motion to abandon the property.

4          On March 25, 2009, one day before granting the Clawson's motion to abandon the

5  property in the main bankruptcy case, the bankruptcy court held a status conference in the

6  adversary proceeding.  The banks did not appear at the conference, and the court noted

7  that they had not filed an answer and that it was going to instruct the clerk to enter a

8  default.  Appellants' Excerpts of Record ("E.R.") Exh. 33.  The Clawsons' counsel noted

9  that they were in settlement discussions with IMFB, noted the existence of the motion to

10  abandon property that they filed in the main bankruptcy case, and stated that he had not

11  yet received the paperwork promised from the banks.  *Id.*

12          The bankruptcy court held a continued status conference on April 29, 2009.  Again,

13  the banks failed to appear at the conference.  The Clawsons' counsel noted that he had

14  been in settlement discussions with IMFB up until the previous evening, and that they had a

15  settlement.  The Clawsons were supposed to receive the stipulation the night of April 28,

16  2009, but did not.  The bankruptcy court expressed frustration at the banks' failure to show

17  up for the hearings and to follow through on the promised stipulation of settlement.  The

18  court advised the Clawsons' counsel to tell the banks "that if [the court doesn't] get a

19  settlement statement or a stipulation from them in seven days, [the court is] going to put in

20  an order for them to show cause why [it] shouldn't sanction them for not appearing at these

21  status conferences."  E.R. Exh. 30 at 4.

22          On May 1, 2009, the bankruptcy court issued an order to show cause, noting that

23  the banks did not appear at the first two status conferences and that the Clawsons had

24  informed the court that they had settled the adversary case.  The court ordered the banks

25  to file an executed stipulation of settlement by May 6, 2009, or stated that an OSC would

26  issue regarding sanctions.

27          On May 6, 2009, counsel for the banks filed a status report asserting that they had

28

4

United States District Court
For the Northern District of California

provided the Clawsons with a proposed settlement agreement and stipulation that was under review by the Clawsons and their counsel, and that following the Clawsons' approval, the agreement would be submitted to the banks for their review and approval. On May 8, 2009, the Clawsons filed a status report with the bankruptcy court noting that they had provided the banks with their revisions to the stipulated settlement on April 29, 2009, and had not heard back from the banks in spite of the bankruptcy court's May 6, 2009 deadline.

On May 14, 2009, the bankruptcy court issued an order to show cause directed at the banks requiring them to appear at a show cause hearing on June 24, 2009 regarding why they should not be sanctioned for failing to appear at the first two status conferences. On June 22, 2009, counsel for the banks, Kristin Schuler-Hintz, filed a declaration apologizing to the bankruptcy court for missing the first two status conferences, and explaining that her failure to attend was based on calendaring errors. Schuler-Hintz noted that due to a conflicting obligation, she would be sending another attorney to attend the June 24, 2009 conference, but provided the court with her phone number so that she could be reached if necessary.

At the June 24, 2009 conference, Paul Kroen appeared as counsel for the banks and represented that a settlement had been drafted, but that OneWest Bank had bought IMFB and that responsibility for the "file" had been shifted from IMFB's loss mitigation department to OneWest's legal department.[3] Exh. 34 at 2. The bankruptcy court noted that the Clawsons were the ones that had suffered as a result of the delay and the banks' failure to appear at the status conferences. It advised the banks' counsel that it was going to sanction IMFB $500.00 for its failure to appear at the prior two status conferences, and that:

> [W]e're going to reset the status conference. And, hopefully, you will have a signed agreement by then, because when I reset it I'm also going to have them show cause why they should not be further sanctioned for failure to

---

[3]During the course of the bankruptcy proceedings, IMFB was put into receivership, and its assets were purchased by OneWest Bank. OneWest was represented by the same counsel as IMFB.

5

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

consummate the settlement that they all - everyone has acknowledged they have.  And the next sanction will be a thousand dollars.  So you tell them that.  Tell the new bank: Welcome to bankruptcy court.  They need to do something when they've got a problem like this and not just sit on it.

*Id.* at 3.  The court subsequently memorialized the ruling in an order.

On August 4, 2009, one day prior to the subsequent status conference, the Clawsons filed a status report advising the court that after OneWest acquired IMFB, it confirmed the settlement that the Clawsons had been negotiating with IMFB.  The Clawsons noted that they had fully performed under the settlement agreement, attached a copy of the July 1, 2009 agreement for the bankruptcy court, which was signed only by the Clawsons and their counsel but not by the banks or their counsel.  The Clawsons stated that they would request that the court assist them in requiring OneWest to finalize the settlement documentation.

At the August 5, 2009 status conference, the banks' counsel, Schuler-Hintz, advised the court that the person at IFMB who had given her the directive to settle the case lacked the authority to settle.  She stated that OneWest, IFMB's successor, still wanted to try to settle the case.  The court queried the banks' counsel regarding the July 1, 2009 settlement agreement that the Clawsons' counsel had submitted to the court the day before.  The banks' counsel stated that one of the officials in IMFB's bankruptcy department gave her the directive to settle the case, but that it turned out that that official did not possess sufficient authority to bind the banks.  Exh. 32 at 4.  She also advised the bankruptcy court that she "wasn't sure" who at OneWest had the authority to authorize the settlement.

The bankruptcy court noted that it appeared that OneWest was "play[ing] games" with the debtors, and asserted that this was the second case it had encountered where OneWest attempted to back out of a settlement agreement.  *Id.*  The court then set an evidentiary hearing to ascertain why an IFMB bank employee without the authority to settle was negotiating settlement agreements.  *Id.* at 6.  It ordered OneWest to designate someone in charge of the loan workout department to appear at the hearing.  *Id.*  Additionally, in its August 7, 2009 order memorializing the ruling, the bankruptcy court

6

**United States District Court**

For the Northern District of California

1    courted stated that the evidentiary hearing would be held "as to why OneWest should not

2    be sanctioned for failing to consummate the previously acknowledged settlement of this

3    adversary proceeding."

4         In advance of the September 16, 2009 hearing, the parties filed lists of witnesses,

5    proposed findings of fact and conclusions of law, and exhibits.   However, as the

6    bankruptcy court subsequently recognized, the banks did not actually tender any of their

7    own exhibits, but instead relied on those submitted by the Clawsons.  Exh. 43 at 2 n.2.[4]

8         In their proposed findings of fact and conclusions of law, the banks asserted that

9    they "adopt[ed] the statement of facts contained in plaintiffs' proposed findings of fact,"

10   noting that "the correspondence between the parties is undisputed."  In their conclusions of

11   law, the banks conceded that the July 1, 2009 settlement agreement - the same agreement

12   previously submitted to the bankruptcy court - "satisfied the first prong" of the Ninth Circuit's

13   test for enforcement, and constituted "a complete agreement."  Exh. 43, at exh. 2.   The

14   bank, however, asserted that although it was a "complete agreement," the parties had not

15   all agreed to the terms of the agreement and that there was "no meeting of the minds."

16   Specifically, the banks stated that Quality and IMFB had "not consented to the terms of the

17   agreement."  Accordingly, the banks contended that the settlement agreement was

18   unenforceable.

19        The bankruptcy court commenced the September 16, 2009 hearing by noting that

20   the purpose of the hearing was to determine "whether. . . OneWest should be sanctioned

21   for failing to consummate a previously-acknowledged settlement and also to determine

22   whether or not there is such a settlement."  Exh. 29 at 3.  In accordance with the

23   bankruptcy court's prior order, the banks brought an employee from OneWest to testify.

24

25        [4]In an October 2, 2009 order, the bankruptcy court admitted all of the evidence
26   submitted by the Clawsons prior to the evidentiary hearing.  After the record on appeal was
     perfected in these cases, the Clawsons requested this court to supplement the record with the
27   thirty-two exhibits admitted by bankruptcy court, which this court granted.  Accordingly, those
     exhibits are part of the record on appeal.  They consist primarily of a series of emails and
28   letters between the parties, in addition to documents filed with the bankruptcy court.

United States District Court

For the Northern District of California

1    The court began by questioning the banks' counsel, Schuler-Hintz, regarding the existence

2    of a settlement.

3        The bankruptcy court noted that in the settlement agreements exchanged among the

4    parties, both parties stated that they "warrant[ed] that they ha[d] the authority to enter into

5    th[e] agreement." *Id.* at 6.  Counsel for the banks asserted that was not the case, though.

6    She also explained that the bank employees she was dealing with were from IMFB's

7    bankruptcy department, and told her to "just settle the case," but that she misunderstood

8    the terms upon which she was supposed to settle.  Counsel stated that IMFB had not

9    actually agreed to the terms in the proposed settlement agreement she provided to the

10   Clawsons' counsel. *Id.* at 10.

11       The bankruptcy court noted that this explanation was different from that offered by

12   Schuler-Hintz at the prior hearing on August 5, 2009. *Id.*  at 17.  It noted that at that

13   hearing, the banks' counsel represented that the reason there was no settlement was

14   because the employee in the IMFB bankruptcy department lacked the authority to settle the

15   case. *Id.*  The court noted that the banks' counsel never asserted at that the prior hearing

16   that she herself put together the agreement without the authority to do so. *Id.*

17       The bankruptcy court queried the banks' counsel regarding whether the IMFB

18   employees with whom counsel dealt were present for the evidentiary hearing.  Counsel

19   replied that they were not.  The only witness that the banks made available for the hearing

20   was Charles Boyle, who worked in the loan department at OneWest**,** and who did not get

21   involved in the settlement until March or April. *Id.*  at 14.

22       The bankruptcy court declined to hear any witness testimony.  Instead, it found that

23   the banks were judicially estopped from challenging their consent to the settlement

24   agreement and were also estopped from challenging their counsel's authority to enter into

25   the agreement.  In so holding, the court stated that:

26       It isn't as though there weren't opportunities for everyone to come forward
         and say, "Oh, there's no settlement here."  For example, such as the hearings
27       that occurred back in May or back in June, and it still didn't happen.  And so
         now the Court and the Plaintiff have been led along to this point, and now are

28

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

told in August, . . . seven months later, that "Oh no, we don't have a
settlement." But we don't have a settlement because the people at [IMFB]
didn't have the authority to settle. Now you [IMFB counsel] are telling me you
didn't have the authority and it was all your idea.

*Id.* at 18.

The court further held that there was no need for an evidentiary hearing regarding

the terms of the settlement because the terms were quite clear. *Id.* at 21. It further clarified

that OneWest, IMFB's successor, was bound by the terms of the settlement agreement

because counsel was representing both IMFB and OneWest at the time. *Id.* The court

then advised plaintiffs that it would entertain in the future a motion for sanctions in the form

of attorney's fees.

On September 25, 2009, the Clawsons filed a motion for sanctions.

In a subsequent October 2, 2009 order, the bankruptcy court memorialized and

expanded on its findings and conclusions made on the record at the September 16, 2009

hearing. The court held that the parties reached an enforceable settlement agreement, and

also that the banks engaged in bad faith and willful misconduct warranting the imposition of

sanctions.

In the order, the bankruptcy court described the history of settlement discussions

and the history of the adversary case. It found that both parties had taken actions in

furtherance of the settlement. Specifically, it noted that the Clawsons sought and obtained

an order of abandonment of property in the main bankruptcy case; and that the banks

cancelled a trustee sale of the Clawsons' residence. The bankruptcy court then suggested

that the banks' counsel's "story" explaining why there was not a settlement was

inconsistent and contrary to the evidence before the court. *Id.* at 5. It found that contrary

to the banks' counsel's statements otherwise, the evidence "indicate[d] that [IMFB] was

fully aware of the material terms of the settlement as early as March [2009], and agreed

with those terms." *Id.* Based on the proceedings before the court, the fact that the banks

never denied the existence of a settlement prior to August 5, 2009, the fact that the banks

never moved to set aside the default in the adversary case or to respond to the complaint,

9

United States District Court
For the Northern District of California

and based on the banks' statements in their proposed findings of fact and conclusions of law, the bankruptcy court found that it was able to conclude that there was an enforceable settlement agreement without an evidentiary hearing. *Id.* at 6.

The court found that the terms of the settlement agreement "were clearly spelled out" in the July 1, 2009 settlement agreement prepared by the banks and signed by the Clawsons. *Id.* at 7. The court also found that it was "equally clear" that the banks "either accepted the agreement or should be deemed to have accepted it" based on judicial estoppel. It concluded that the banks were judicially estopped from denying that they agreed to the settlement agreement "[r]egardless of whether [IMFB] was fully informed of the plaintiffs' proposal but simply ignored it, and then misled its attorney by its silence; or [IMFB] agreed to the terms of the settlement, but OneWest refused to honor it; or the defendants and OneWest committed other acts of misfeasance and malfeasance that have brought this matter to this sorry state." *Id.* at 7. In conclusion, the court held that the banks "are hereby adjudged to have accepted the July 1, 2009 agreement signed by the plaintiffs and are fully bound by the terms thereof." *Id.* at 8.

Regarding sanctions, the bankruptcy court further found that the banks' "failure to appear at status conferences and respond in timely fashion to court orders alone amply support[ed] a finding of bad faith in the conduct of this litigation." It determined that "the total indifference shown towards the court's processes, the waste of judicial resources that resulted, and the misleading statements made to both the court and plaintiff's counsel, constituted willful misconduct" under Ninth Circuit law. It held that the appropriate sanction was to require the "banks to pay a reasonable attorney fee to plaintiff's counsel for all time spent on the adversary proceeding since April 29, 2009, less the $500.00 in sanctions that have already been awarded."

On October 8, 2009, the Clawsons' counsel filed a declaration of his time as required by the bankruptcy court in its October 2, 2009 order. The banks filed an opposition to the Clawsons' motion for attorney's fees on November 2, 2009, and the

United States District Court

For the Northern District of California

1    Clawsons filed a reply on December 2, 2009.

2    Based on the Clawsons' attorney's fee application, the motion papers and exhibits,

3    and a December 9, 2009 hearing, the bankruptcy court found that $16,739.00 constituted

4    reasonable attorney's fees and sanctioned the banks in that amount, to be paid to the

5    Clawsons' attorney.

6                                          **ISSUES**

7    The banks raise four issues on appeal, including whether:

8    1.    the bankruptcy court erred in finding that a settlement was reached between

9          the banks and the Clawsons;

10   2.    the bankruptcy court erred in applying the doctrine of judicial estoppel to force

11         the banks to comply with the terms of the proposed settlement agreement;

12   3.    the bankruptcy court erred in finding that the banks acted with bad faith and

13         willful misconduct; and

14   4.    the bankruptcy court erred in awarding attorney's fees to the Clawsons as a

15         sanction against the banks.

16                                      **DISCUSSION**

17   **A.    Standards of Review**

18   The court reviews the bankruptcy court's enforcement of a settlement agreement for

19   an abuse of discretion. *Doi v. Halekulani Corp.*, 276 F.3d 1131, 1136 (9th Cir. 2002).

20   Whether a party assented to a settlement and intended to be bound by it are factual

21   determinations reviewed for clear error. *Graham v. Balcor Co.*, 146 F.3d 1052, 1054 (9th

22   Cir. 1998). A factual finding is clearly erroneous if, after examining the evidence, the

23   reviewing court "is left with the definite and firm conviction that a mistake has been

24   committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985). Questions regarding

25   interpretation of the settlement document are legal issues reviewed de novo. *Congregation*

26   *Etz Chaim v. City of Los Angeles*, 371 F.3d 1122, 1124 (9th Cir. 2004); *Petro-Ventures, Inc.*

27   *v. Takessian*, 967 F.2d 1337, 1340 (9th Cir. 1992).

28

                                             11

United States District Court

For the Northern District of California

1   The court reviews the bankruptcy court's application of judicial estoppel to this case

2   for an abuse of discretion.  *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th

3   Cir. 2001).  It also reviews the bankruptcy court's imposition of sanctions for an abuse of

4   discretion.  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991).

5   **B.      Bankruptcy Court's Rulings re: Settlement Agreement**

6   The court addresses below the first two issues raised by the banks.

7   **1.      Application of Judicial Estoppel**

8   As noted, the bankruptcy court held that the banks were judicially estopped from

9   denying that they had agreed to the settlement agreement.  The banks argue that the

10  bankruptcy court erred in applying judicial estoppel because it failed to identify a single

11  statement by IMFB that a settlement existed or that it had agreed to a settlement that it

12  later contradicted.  They note that the statements regarding settlement were instead made

13  primarily by the Clawsons' counsel.

14  The Clawsons, however, contend that the bankruptcy court was entitled to apply

15  judicial estoppel based on the banks' counsel's admission that she was told by an IMFB

16  employee to "just settle the case" and based on their counsel's statement at the June 24,

17  2009 hearing that the settlement agreement had been drafted.

18  Federal law governs the application of judicial estoppel in cases litigated in federal

19  court.  *Risetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 603-04 (9th Cir. 1996).

20  "Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent

21  positions, precludes a party from gaining an advantage by taking one position, and then

22  seeking a second advantage by taking an incompatible position."  *Id.* at 600; *see also In re*

23  *Hoopai*, 581 F.3d 1090 (9th Cir. 2009).  It is an equitable doctrine invoked by a court at its

24  discretion to protect against a litigant playing fast and loose with the courts.  *Id.* (quoting

25  *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)).  In determining whether to apply the

26  doctrine, a court should consider: "(1) whether a party's later position is 'clearly

27  inconsistent' with its original position; (2) whether the party has successfully persuaded the

28

12

United States District Court

For the Northern District of California

1   court of the earlier position; and (3) whether allowing the inconsistent position would allow

2   the party to 'derive an unfair advantage or impose an unfair detriment on the opposing

3   party.' " *In re Hoopai*, 581 F.3d at 1097 (quoting *New Hampshire v. Maine*, 532 U.S. 742,

4   750-51 (2001)).

5          The court has carefully reviewed the record and concludes that the banks' assertion,

6   via counsel, that they did not actually agree to the terms of the settlement was not "clearly

7   inconsistent" with prior statements.  If the banks' counsel had indeed previously stated or

8   represented to the court that the case had settled and that the banks had agreed on the

9   terms of the settlement, then judicial estoppel would preclude the inconsistent statements

10  to the contrary.  That, however, is not what happened here.  The banks' counsel did not

11  make any clear statements that the case had indeed settled and that the parties had

12  agreed on the terms of the settlement.  Instead, almost all of the statements regarding the

13  existence of a settlement were made by the Clawsons' counsel.

14         It is true that the banks failed to appear at two status conferences and failed to

15  meaningfully participate in the early proceedings before the court.  However, the record

16  reveals that the representations made by the banks' counsel were only that settlement

17  negotiations were underway.  The statement relied on by the Clawsons to support the

18  bankruptcy court's application of judicial estoppel does not actually reflect that the parties

19  had agreed on the terms of a settlement.  In that statement, made on the record at the

20  June 24, 2009 hearing, attorney Paul Kroen appeared on behalf of the banks because

21  Schuler-Hintz was unavailable.  In response to the bankruptcy court's question regarding

22  whether there had been a settlement signed by IMFB, Kroen represented that the

23  settlement had been drafted, but qualified the statement, noting that "it's being reviewed."[5]

24         Accordingly, the court finds that the bankruptcy court abused its discretion in

25

26  _____

27  [5]The other statement relied on by the Clawsons is one that an IMFB bank employee
    made to the banks' counsel, Ms. Schuler-Hintz that she "just settle the case."  That was not
    a representation made by the banks before or to the bankruptcy court, and therefore is
    irrelevant for purposes of *judicial* estoppel.

28

                                              13

1    applying judicial estoppel to enforce the settlement agreement.

2        **2.    Settlement Agreement**

3        That leads the court to the next inquiry: whether the record nevertheless reveals an

4    enforceable settlement agreement rendering the erroneous application of judicial estoppel

5    harmless.

6        As noted, in addition to its determination that the banks were judicially estopped

7    from challenging the existence of a settlement agreement, the bankruptcy court also

8    concluded that based on the banks' admission in their proposed findings of fact and

9    conclusions of law that "there was a complete agreement," that the agreement located at

10   Exh. 26 submitted by the plaintiffs constituted an enforceable settlement agreement.  It

11   further held that there was no factual dispute regarding the existence and/or the terms of

12   the agreement, and that the terms were those in Exh. 26.

13       Exhibit 26 included a July 1, 2009 letter from Sternberg to Schuler-Hintz and a

14   stipulation and order for dismissal of the adversary procedure, which was signed by the

15   Clawsons and approved by Sternberg.  It was not, however, signed by the banks or their

16   counsel.  The exhibit also contained a copy of a check from the Clawsons made out to

17   IMFB in the amount of $2,479.53, dated July 1, 2009.  Sternberg's letter advised Ms.

18   Schuler-Hintz that he was

19       sending this letter pursuant to the agreement that we entered into in February
20       2009 and subsequently modified by changing the commencement date to
         April 1, 2009, then further modified to commence on July 1, 2009.  Enclosed
21       please find the agreement executed by my clients and me with the
         handwritten, initialed verbally-agreed-to revised commencement date of July
22       1, 2009.  Also enclosed is the first check pursuant to the agreement.

23       I understand Judge Newsome wants this signed as soon as possible,
         especially in light of the continued Status Conference and OSC scheduled for
24       August 5, 2009.  I hope that we are able to resolve this matter prior to
         Monday, July 6, 2009, which is approximately ten days after the past [sic]
25       hearing date.  To that end, I left you a telephone message to which I have
         received no response.

26       The court further found that based on Exhs. 11 and 12, IMFB was fully aware of the

27   material terms of the settlement and had agreed to them.  Exhibit 11 contained a March 16,

28

                                        14

2009 email exchange between the banks' counsel, Ms. Schuler-Hintz and Kelly McKinney, a litigation and default risk management specialist at IMFB.  In the first email in the thread, McKinney wrote to Schuler-Hintz, that she " just wanted to check the status on the loan modification packet that Mr. Clawson was working on.  Was this packet sent out to IM[F]B yet?"  Schuler-Hintz responded with an email stating, "[a]ttached is debtor's offer to modify the loan which will resolve the pending adversary proceeding.  How would Indymac like to go about effectuating this?"  The exhibit contained no further response from McKinney, nor did it contain the attachment Schuler-Hintz sent to McKinney representing the Clawsons' "offer to modify the loan."

Exhibit 12 represents another email thread, and appears to contain McKinney's response to Schuler-Hintz's email above.  The first email in the thread is a March 17, 2009 email from McKinney to Schuler-Hintz, asking her to:

> Please advise opposing counsel that a loan modification agreement/work out packet must be completed by the borrower Mr. Clawson in order for our Loss Mitigation team to modify the loan.  Attached is a copy of the loan modification.

The next email is a March 24, 2009 email from Schuler-Hintz to Sternberg, stating

> Attached please find the loan modification package for your client to complete so that we can complete the loan modification.  It is my understanding that everyone is on board with resolving this through the loan modification you outlined.  If you can have this completed we should be one step much [sic] closer to resolving this matter.

The final email in exhibit 12 is a March 25, 2009 email from Sternberg to his client, Debra Clawson, advising her that, " I guess you fill this out with my help and let's get it to them."  None of the referenced attachments were provided to this court with the exhibit.[6]

Additionally, the bankruptcy court found that contrary to her statements otherwise, the banks' counsel possessed the authority to agree to the settlement, or alternatively that counsel was estopped from denying that she possessed the authority to enter into the agreement based on language that she added to the agreement warranting that she had

---

[6]It is unclear whether the attachments were included with the exhibits provided to the bankruptcy court.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  the authority to enter into the agreement.  E.R. 29 at 6.

2         In their opening brief, the banks argue that they never manifested their consent to be

3  bound by the settlement.  They contend that the fact that their attorney drafted the

4  proposed settlement agreement is not sufficient to bind them, and that there was no

5  "meeting of the minds."[7]  They suggest that the bankruptcy court assumed that because the

6  proposed agreement was drafted by their counsel, it was an offer made by IMFB and

7  accepted by the Clawsons when they signed the agreement.  The banks contend that this

8  assumption was erroneous because the settlement terms were actually proposed by the

9  Clawsons, and the simple fact that the banks' counsel drafted the agreement does not

10  change the fact that the offer came from the Clawsons.

11        The banks argue that the bankruptcy court erred in refusing to hold an evidentiary

12  hearing because the existence of a settlement agreement - and specifically, whether the

13  banks intended to settle on the proposed terms - was in dispute.  They also assert that the

14  bankruptcy court should have held a hearing regarding whether their attorney possessed

15  the authority to settle the case on the terms contained in Exhibit 26, and argue that there

16  was nothing in the record to contradict the banks' counsel's assertions that she lacked

17  authority to enter into the settlement agreement.

18        In opposition, the Clawsons contend that an evidentiary hearing was unnecessary

19  given the banks' admission that there was "a complete agreement" in their proposed

20  findings of fact and conclusions of law.  They interpret this admission to mean that there

21  was no dispute as to the terms of or the existence of an agreement.

22        Additionally, the Clawsons argue that the bankruptcy court found that the banks

23  consented to the settlement agreement based not only on the fact that their counsel drafted

24  the agreement, but also based on the authority the banks gave their counsel and the banks'

25  own involvement in the negotiations.  The Clawsons counter that even if the banks are

26

27        [7]There appears to be some factual dispute as to which side proffered the initial terms
   of the agreement reduced to writing by Schuler-Hintz, counsel for the banks.
28

United States District Court

For the Northern District of California

1  correct and it could be said that the Clawsons were the ones who drafted the "offer,"

2  Schuler-Hintz's March 24, 2009 email conveying a request that the Clawsons complete a

3  workout agreement constituted a counteroffer from the banks that they accepted.

4      The Clawsons argue that the real issue is not whether there was a meeting of the

5  minds but whether IMFB authorized its counsel to enter into the settlement.  They assert

6  that California law applies, and that an attorney's authority to bind her client derives from

7  agency principles.  They concede that Schuler-Hintz's status as counsel alone did not give

8  her the authority to bind her client.  However, the Clawsons contend that based on the

9  evidence, the banks' counsel had the actual authority to settle the case.  Specifically, they

10 point to the IMFB employees' involvement in the settlement negotiations, and the

11 employee's statement to Schuler-Hintz to "just settle the case."

12     Alternatively, even if the banks did not actually authorize counsel to settle the case,

13 the Clawsons argue that the banks ratified their counsel's conduct by failing to object and

14 by benefiting from the settlement.  They note the abandonment of property motion filed in

15 the main bankruptcy case and the fact that they did not seek other relief for the banks'

16 violation of the automatic stay.

17     In reply, the banks argue that there was no evidence that they had ever agreed to

18 the terms of the drafted settlement, and note that they actually returned the check

19 referenced in Exhibit 26 to the Clawsons.  They also argue that the Statute of Frauds

20 required the proposed settlement agreement to be in writing, and that the conduct of all of

21 the parties throughout the negotiations evidenced an intent that the final settlement would

22 be in writing and signed by all parties.  At most, the banks assert that the evidence reveals

23 they were in continuing negotiations with the Clawsons and *not* that they had accepted a

24 final enforceable settlement agreement.

25     Finally, the banks argue that there was no evidence that they had knowledge of the

26 proposed agreement such that they could be deemed to have ratified their counsel's

27 conduct.  They contend that there is a factual dispute as to whether or not their counsel

28

United States District Court

For the Northern District of California

1    was expressly told that the banks could not settle on the terms contained in the agreement.

2    The banks also dispute whether they "benefitted" from the settlement terms.

3        For the reasons that follow, the court concludes that the bankruptcy court abused its

4    discretion when it refused to hold an evidentiary hearing regarding whether the banks

5    consented to the terms of the settlement agreement and also regarding whether the banks'

6    counsel possessed the authority to settle on the terms contained in the agreement.

7        Federal courts have equitable power to summarily enforce settlement agreements in

8    cases pending before them. *See Callie v. Near*, 829 F.2d 888 (9th Cir. 1987).  To be

9    enforceable, a settlement agreement must be complete and both parties must have

10   consented.  *Id.*  When material facts as to the existence or terms of a settlement are in

11   dispute, an evidentiary hearing is necessary.  *Id.*

12       California contract law governs the construction and enforceability of the settlement

13   agreement in this case.  *See United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962

14   F.2d 853, 856 (9th Cir. 1992).  Under California law, a settlement agreement is a contract,

15   and the legal principles which apply to contracts generally apply to settlement agreements.

16   *See Gorman v. Holte*, 164 Cal.App.3d 984, 988 (Cal. Ct. App. 1985); *United Commercial*,

17   962 F.2d at 856. ("A settlement agreement is treated as any other contract for purposes of

18   interpretation.").

19       An agreement to make an agreement, without more, is not a binding contract.

20   *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 315 (9th Cir. 1996).  Whether a writing

21   constitutes a final agreement or merely an agreement to make an agreement depends

22   primarily upon the intention of the parties.  *Id.*  "Preliminary negotiations or an agreement

23   for future negotiations are not the functional equivalent of a valid, subsisting agreement."

24   *Id.*  A contract does not exist where the objective manifestations of intent demonstrate that

25   the parties chose not to bind themselves until a subsequent agreement is made.  *Id.* at 316.

26   If there is a manifest intention that a formal agreement is not to be complete until reduced

27   to a formal writing to be executed, there is no binding contract until this is done." *Binder v.*

28

18

United States District Court

For the Northern District of California

*Aetna Life Ins. Co.*, 75 Cal.App.4th 832, 851 (Cal. Ct. App. 1999).

Here, the evidence before the bankruptcy court and before this court in the record on appeal - without more - does not sufficiently demonstrate that the banks had consented to the settlement agreement.  The banks had not signed the draft agreement at Exh. 26, and the evidence suggested that all parties were aware that the final settlement agreement was to be reduced to writing and signed by all of the parties.  *See Secrest v. Security National Mortgage Loan Trust*, 167 Cal.App.4th 544, 552 (Cal. Ct. App. 2008).

This case is distinguishable from the *Doi* case relied on by the bankruptcy court.  In *Doi*, the Ninth Circuit concluded that an evidentiary hearing was unnecessary because the parties placed the material terms of the settlement agreement on the record and made representations that were binding.  276 F.3d at 1138-39.  The *Doi* court distinguished its earlier decision in *Callie,* in which it had held that the district court abused its discretion when it failed to conduct an evidentiary hearing prior to enforcing a settlement agreement where the alleged settlement agreement that the plaintiffs sought to enforce arose from a series of letters that contained proposals and counter-proposals.  *Id.* (discussing 892 F.2d at 890).

The facts of this case are much more akin to *Callie* than *Doi*, and the bankruptcy court was therefore required to hold an evidentiary hearing to determine whether a final settlement agreement had been reached and consented to by both of the parties.  The banks' statement in its proposed findings of fact and conclusions of law that the parties had a "complete settlement agreement" was expressly qualified by their contention in the same proposed findings of fact and conclusions of law that that they had "not agreed to the terms set forth in the agreement," and that it was unenforceable for that reason.  Accordingly, there is a disputed issue of fact regarding whether the banks consented to the terms set forth in the agreement at Exhibit 26.

There is also a disputed issue regarding whether counsel possessed the authority to settle on the terms contained in the agreement at Exhibit 26 and/or whether the banks

19

United States District Court

For the Northern District of California

1   alternatively "ratified" the agreement.  Where an agreement was negotiated between

2   counsel, the attorneys must have had their respective clients' actual authority.  *Harrop v.*

3   *Western Airlines*, *Inc.*, 550 F.2d 1143, 1144-45 (9th Cir. 1977) (citing *Linsk v. Linsk*, 70

4   Cal.2d 272, 277-79 (Cal. Sup. Ct. 1969)).  Attorneys do not have inherent power by virtue

5   of their employment alone to compromise a client's claim.  *Id.*

6        Courts are split, and the Ninth Circuit has not decided whether state law or federal

7   common law governs whether an attorney who appears in federal court is authorized to

8   bind a client to a settlement agreement.  Several circuits apply federal common law with a

9   presumption favoring the attorney's authority.  *See Fennell v. TLB Kent Co.*, 865 F.2d 498,

10  501 (2nd Cir. 1989) ; *Mid-South Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 389 (5th Cir.

11  1984); *Larson v. Heritage Square Assocs.,* 952 F.2d 1533, 1537 (8th Cir. 1992); *Kelley v.*

12  *Euromarket Designs, Inc.*, 2008 WL 109332 at *3 (E.D. Cal. 2008).  Other courts, however,

13  hold that state law governs whether an attorney is authorized to settle on behalf of a client.

14  *Makins v. District of Columbia,* 277 F.3d 544, 547-548 (D.C. Cir. 2002); *Pohl v. United*

15  *Airlines, Inc.,* 213 F.3d 336, 338 (7th Cir. 2000); *Anand v. California Dept. of*

16  *Developmental Services,* 626 F.Supp.2d 1061, 1066 (E.D. Cal. 2009).

17       Federal common law recognizes a presumption that an attorney has authority to

18  settle on behalf of the client, rebuttable only by evidence that the attorney was acting

19  outside the scope of authority.  *See In re Artha Management, Inc.*, 91 F.3d 326 (2d Cir.

20  1996).  California law does not recognize a similar presumption, though.  California requires

21  an attorney to have express authority to settle a client's claims, and there is no presumption

22  that a settlement is binding on the client.  *See Linsk*, 70 Cal.2d at 277-79.  When a client

23  claims an attorney settled without authority, the court must take evidence on which to base

24  a factual determination.  *See Bice v. Stevens*, 160 Cal.App.2d 222, 232-33 (Cal. Ct. App.

25  1958).

26       Although both parties assume that California law applies, that appears to be an open

27  issue.  This court need not resolve which law applies, though, because it concludes that

28

20

**United States District Court**
For the Northern District of California

1    under either federal common law or California law, the bankruptcy court was required to

2    take evidence on whether the banks' counsel possessed authority to enter into the

3    settlement.  The banks' counsel suggested that she could present evidence that she lacked

4    the requisite authority to enter into the settlement agreement on the terms contained in

5    Exhibit 26.  Accordingly, the bankruptcy court should also take evidence on this issue at

6    any future evidentiary hearing.

7         Finally, this court notes that the banks have raised issues for the first time on appeal

8    that were not raised before, nor addressed by the bankruptcy court, regarding IMFB's

9    ability to bind its successor, OneWest pursuant to 12 U.S.C. § 1823(e), and also regarding

10   whether judicial estoppel may be applied against OneWest with respect to representations

11   made by IMFB.  This court declines to rule on issues for the first time on appeal that were

12   neither raised before nor considered by the bankruptcy court.  In the event the bankruptcy

13   court concludes that an enforceable settlement agreement exists after the evidentiary

14   hearing, then it should also address whether OneWest may be bound by its future orders.

15        In sum, on remand, in re-evaluating the enforceability of the settlement agreement,

16   the bankruptcy court must hold an evidentiary hearing at which it entertains evidence

17   regarding: (1) whether the banks consented to the settlement agreement contained at Exh.

18   26; (2) whether the banks' counsel possessed the authority to settle the case on behalf of

19   the banks on the terms included in the agreement at Exh. 26; (3) if the banks' counsel did

20   not possess such authority, whether the banks ratified counsel's conduct and should be

21   bound anyway; and (4) whether OneWest may be bound by representations made by

22   IMFB.

23   **C.    Sanctions**

24        The court addresses below issues three and four raised by the banks on appeal.

25        In their opening motion filed with the bankruptcy court, the Clawsons argued that

26   they were entitled to attorney's fees from July 1, 2009 through the resolution of the fees

27   motion, based on the banks' bad faith refusal to execute the settlement agreement.

28

United States District Court

For the Northern District of California

1   In their opposition filed after the bankruptcy court's October 2, 2009 order, the banks

2   argued that the portion of the October 2, 2009 order awarding attorney's fees as sanctions

3   should be discharged and the Clawsons' motion for attorney's fees should be denied.  The

4   banks contended that any misrepresentations that were made during the course of the

5   adversary proceedings were made by the Clawsons and their counsel, and not by the

6   banks or the banks' counsel.  They argued that the Clawsons' counsel misrepresented the

7   fact of settlement as early as March 24, 2009, and contended that the most obvious

8   evidence that there was no settlement was the fact that the banks never signed the

9   settlement agreement.

10   At the December 9, 2009 hearing, which was not an evidentiary hearing, the

11   bankruptcy court rejected the banks' allegations in their opposition that the Clawsons

12   and/or their counsel made misrepresentations regarding the status of the settlement,

13   stating that the case described in the banks' papers "sounded like some other case that [it]

14   had never heard of."  It asserted that it already found in its [October 2, 2009] order that fees

15   were appropriate, but that the bank failed to address the issue of fees.  The court declined

16   to reconsider whether the Clawsons were entitled to fees, subsequently determined that the

17   Clawsons' counsel's billing records were inadequate for several entries, and awarded

18   $16,739.00 in fees.  It further advised counsel for the banks to reiterate to the banks that

19   their prior note and loan agreement were no longer operative, and that their rights were

20   now governed by the settlement agreement.  On December 10, 2009, the court

21   subsequently issued a summary order memorializing its ruling.

22   The banks argue before this court that the bankruptcy court failed to provide them

23   with proper notice and an opportunity to respond prior to imposing sanctions.  They note

24   that the Clawsons filed their motion for attorney's fees on September 25, 2009, which was

25   originally set for a hearing on November 4, 2009, but that the bankruptcy court actually

26   granted the request for attorney's fees as sanctions in its October 2, 2009 order without

27   affording the banks an opportunity to oppose the motion in writing or otherwise.  They

28

22

**United States District Court**
For the Northern District of California

1   therefore argue that they never had an opportunity to contest the bad faith finding made by

2   the bankruptcy court in the October 2, 2009 order because it never held an evidentiary

3   hearing, but instead, at the December 9, 2009 hearing, allowed them an opportunity to

4   dispute only the amount of fees already awarded to the Clawsons.

5       The Clawsons respond that the bankruptcy court actually advised the banks in

6   writing beforehand that the purpose of the September 16, 2009 hearing was to determine

7   whether the banks could be sanctioned for failing consummate the settlement agreement.

8   The banks reply that although the bankruptcy court advised the parties that that was the

9   purpose of the September 16, 2009 hearing, it did not actually provide any opportunity to

10  oppose  sanctions at that hearing, and in fact noted at the end of the hearing that it would

11  "entertain a motion for sanctions," and *not* that it had already determined sanctions were

12  appropriate.

13      Federal courts have "inherent" power to impose sanctions against both attorneys

14  and parties for "bad faith" conduct in litigation or "willful disobedience" of a court order.

15  *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766-767 (1980).  However, attorneys and

16  parties are entitled to some sort of notice and hearing before the court holds them liable for

17  attorney's fees.  *Id. (* "[l]ike other sanctions, attorney's fees certainly should not be

18  assessed lightly or without fair notice and an opportunity for a hearing on the record");

19  *accord Barnd v. City of Tacoma*, 664 F.2d 1339, 1342-43 (9th Cir. 1982) (reversing district

20  court's order that defense counsel pay costs and fees as a sanction and remanding for

21  evidentiary hearing); *United States v. Blodgett*, 709 F.2d 608 (9th Cir. 1983) (same);

22  *Miranda v. Southern Pacific Transportation Co.*, 710 F.2d 516 (9th Cir. 1983) (same).

23      Here, although this court understands the bankruptcy court's frustration with the

24  banks' failure to meaningfully participate in the adversary proceedings, which is borne out

25  in the record before this court, it nevertheless concludes that the banks were not provided

26  with a sufficient opportunity to be heard on the issues of bad faith and the propriety of

27  sanctions prior to the bankruptcy court's October 2, 2009 order awarding sanctions in favor

28

of the Clawsons.  Specifically, the court did not provide the banks with an opportunity to address and/or develop an evidentiary record regarding the reasons for their failure to execute and/or consummate the settlement agreement.

For these reasons, the court concludes that the bankruptcy court's December 10, 2010 order awarding sanctions constituted an abuse of discretion.  On remand, the bankruptcy court must afford the banks an opportunity to make a record regarding why they failed to execute and/or consummate the settlement prior to making any bad faith findings and/or awarding sanctions.  If, however, on remand, the bankruptcy court finds that the banks failed to consent to the settlement agreement, and that there was in fact no agreed-upon settlement to consummate, then the issue of sanctions *for that purpose* will be moot.

However, the court recognizes that in its October 2, 2009 order, the bankruptcy court also suggested that it was awarding sanctions based on the misleading statements made by the banks' counsel and the banks' waste of judicial resources.  The consummation, or lack thereof, of a settlement agreement would likely be irrelevant to the issue of sanctions based on these other reasons.  Nevertheless, the bankruptcy court must provide the banks with an opportunity to be heard on counsel's misrepresentations and the banks' disregard for judicial resources as well.

## CONCLUSION

For these reasons, the bankruptcy court's orders enforcing the settlement agreement and awarding sanctions are REVERSED and this matter is REMANDED to the court for further proceedings in accordance with this order.  This order fully adjudicates the appeals and terminates all pending motions for these cases.  The clerk shall close the files.

**IT IS SO ORDERED.**

Dated: August 13, 2010

_____
PHYLLIS J. HAMILTON
United States District Judge